HAMMOND (ASTROM v.). See Case No. 596.

HAMMOND (BROCKETT v.). See Case No. 1,916.

HAMMOND (BURBANK v.). See Case No. 2,137.

HAMMOND (COOK v.). See Case No. 3,159.

HAMMOND v. COOLIDGE. See Case No. 5,-999.

---

## Case No. 6,001.

HAMMOND v. ESSEX FIRE & MARINE INS. CO.

[4 Mason, 196.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1826.

MARINE INSURANCE — ABANDONMENT—WAGES OF SEAMEN—UNDERWRITER'S LIABILITY.

1. After an abandonment of a vessel is accepted by the underwriters, they become owners for the voyage, and are liable for seamen's wages from the time they become owners. They are entitled to the freight earned from that period.

2. Where the vessel and freight are separately insured, after an abandonment made to each set of underwriters, the underwriters on the freight are entitled to the freight earned before that time, and the underwriters on the vessel to that earned after.

3. If after an abandonment, the voyage is continued by the underwriters without objections, it is presumed to be continued on the original terms as to compensation of the master and seamen.

[Cited in The Merchant, Case No. 9,434.]

4. A master, it seems, may maintain a suit in personam in the admiralty for wages, or for compensation in the nature of wages.

5. If the master make a special contract to receive a moiety of the freight in lieu of wages, and procures insurance on his part of the freight, and abandons as for a total loss, and freight is subsequently earned, his abandonment does not operate as an assignment of the freight so subsequently earned, and he is entitled to recover his moiety of the same freight against the owners, or abandonees, who have received it.

This was a suit in admiralty in personam, brought by [William Hammond], the master of the schooner Sally, for his wages and supplies for part of the voyage, of which the defendants became owners by an abandonment to them as underwriters. The facts were as follows: The schooner belonged to Messrs. Putnam, Cheever, and others, of Danvers, and on the 21st of October, 1824, was lying at the port of New York. On that day the owners entered into an agreement with the libellant as follows: "Articles of agreement &c. between &c. Said Hammond agrees to take the schooner Sally, owned &c., for the purpose of freighting from New York to the

southward and elsewhere, as he may deem most for their interests. Said Hammond agrees to victual, man, and load and unload said vessel at his own expense, excepting boat hire, which is to be taken from the whole stock, and pay to the owners one half of her earnings or freight money, and one quarter of the passage money, after deducting the pilotage and dockage out of the whole stock. The owners agree, on their part, to keep the hull, rigging, and sails of said schooner in good repair at their own expense. Said Hammond agrees to pay over to the owners their proportion of the earnings of said schooner, as fast as it becomes due. Said (owners) agree, that in case Capt. Hammond should make a voyage to any foreign port, that they will pay one half of the charge for tonnage duty, anchorage duty, and custom-house expenses." In consequence of this agreement, the libellant took the command of the schooner as master, and performed several voyages therein. Afterwards, in July, 1825, he procured a cargo at New York, on freight, or a charter for a voyage to Surinam and back to New York. In the course of the voyage the vessel encountered a very severe gale or hurricane, and was so much injured, that she put into Norfolk for repairs. She was there repaired at an expense exceeding her value, and after being repaired, the libellant pursued the voyage, and earned the whole freight by the return of the vessel to New York. In November, 1824, the owners of the schooner procured the defendants to underwrite a policy on the schooner for 2000 dollars, valuing her at 2000 dollars, for a period not exceeding twelve months, at and from all places &c. &c., for all purposes of trade &c. &c., comprehending the voyage in question. Upon hearing of the disasters to the vessel, the owners abandoned to the underwriters on this policy on the 10th of September, 1825, and the abandonment was duly accepted, and the loss paid. In July, 1825, Messrs. Putnam and Cheever, "for themselves and whom it may concern," procured another policy to be underwritten by the Mercantile Insurance Company in Salem, of 2000 dollars on the freight of the schooner (whole freight valued at the same sum), at and from New York to Surinam, and at and from thence to New York, the company not to be accountable for wages and provisions, unless as a general average. The sum of 1000 dollars, insured by this policy, was for the account of the libellant. An abandonment of the freight was also made upon this policy, and a total loss paid by the underwriters, 1000 dollars of which has been received by the libellant. While the vessel was at Norfolk repairing, the owners wrote (in January, 1826) to the libellant, informing him that he was to consider himself in the employ of the underwriters from the time of the abandonment, as they had paid for her. They had written him, in the previous September, that the abandonment was made on

---

[1] [Reported by William P. Mason, Esq.]

the 10th of the same month. The freight earned by the voyage to Surinam and back to New York had been received by the defendants before the suit was brought. The libellant claimed wages for the voyage from the time of the abandonment; and also compensation for provisions belonging to him then on board, and afterwards expended on the voyage. It was agreed that, if the libellant was entitled to any wages, fifty dollars per month was a reasonable compensation.

Mr. Dunlap, for libellant, contended, that the common principles of equity sustained the claim of the libellant; he had, in the course of his regular business, when no voluntary courtesy could be presumed, rendered a service to the respondents, which entitled him to a reasonable recompense. 1 Esp. 178. This service was also rendered almost by the express direction, and clearly with the subsequent assent of the respondents. Upon the happening of the loss, he became by law the agent of all concerned, bound to do every thing in his power for their benefit, and his acts bona fide were binding upon them. Cond. Marsh. 578; Milles v. Fletcher, 1 Doug. 231. That it was evident, from the correspondence, that he was considered in this light by the parties. By the French law the insurer on the ship, upon an abandonment, became entitled not only to the freight which might be subsequently earned, but to that previously earned, and growing due. Cond. Marsh. 602; cites Emerig. Ins. tome 2, p. 221. By the English law, where there are different sets of underwriters upon ship and freight, upon an abandonment, it seemed clear, that the underwriters upon freight were, at all events, entitled to no more than that part of the freight growing due at the time of the loss. That was the utmost extent of their right, and their right even to that has been denied. Phil. Ins. 478. But that the freight subsequently earned passed with the abandonment of the ship, of which the insurer became the owner, entitled "to all her future earnings," and "liable for all her future outgoings:" Marsh. Ins. lib. 1, c. 13, § 4. That in the United States, especially in Massachusetts, the doctrine was considered as settled, that when a ship and freight were both insured, as in this case, by different policies, and an abandonment took place, the underwriters upon the freight were entitled to all the freight which might be previously earned, and those on the ship to all which might be subsequently acquired. 1 Johns. Cas. 377; 2 Johns. Cas. 443; 1 Caines, 578; 3 Caines, 20; 15 Mass. 541. That if these positions were correct, the respondents became the owners, and the libellant became their agent and master from the time of the loss. The respondents could not expect to obtain a master for their vessel without paying for his services, nor could the libellant be required to devote his time and services without a recompense. The objection raised was,

that the master's interest in the freight for the whole voyage was insured; that upon the happening of the loss, and his abandonment, he received from the insurers of the freight all that he could have received in case no loss had happened, and that all his interest in the freight passed, and became assigned to the underwriters upon the freight; that the answer to this objection was, that what the libellant received from the insurers of freight, was the fruit of a contract to which the insurers of the ship were neither parties nor privies. It was a wager of his own, where he paid the whole stake, the premium, and with the gain or loss of which they had no concern. A creditor insures for a term the life of his debtor, who dies within the term, and he receives the whole sum insured; yet the debt remains unaffected and undischarged. The owners of the ship were jointly interested with the libellant in the policy upon the freight. It would not be pretended, that he was bound to prosecute the voyage farther after the loss; that there can be no greater obligation upon the libellant than upon the owners; it being clear, that the underwriters upon the freight could claim none of the freight subsequently earned, and derive none of the benefit of the libellant's services in the continuation of the voyage. It seemed difficult to perceive, why the circumstance of the libellant's having effected a policy upon the freight, should furnish a reason for repelling the present claim.

Mr. Nichols, for respondent, contra.

STORY, Circuit Justice. In this case it is not disputed, as I understand the argument, that after an abandonment is accepted, the underwriters, as owners of the ship, are liable to the payment of the wages of the master and mariners for the residue of the voyage after they become owners. This is a doctrine so consonant with the general principles of law, and, as far as authorities go, so well supported, that in ordinary cases of hire, there would not seem much room for controversy. Marsh. Ins. c. 13, § 4, p. 602; Thompson v. Rowcroft, 4 East, 34; Sharp v. Gladstone, 7 East, 24; Case v. Davidson, 5 Maule & S. 79, 8 Price, 569; McBride v. Marine Ins. Co., 7 Johns. 431; Coolidge v. Gloucester Ins. Co., 15 Mass. 347; Marsh. Ins. bk. 1, c. 13, § 4, p. 602. The abandonee of a ship is entitled to her earnings acquired after the abandonment; and whether the freight be earned upon a general contract, or upon a charter-party, although it may make a difference as to the form of the remedy to recover it; yet it does not seem to make any difference as to the right of the abandonee. Splidt v. Bowles, 10 East, 279; Chinnery v. Blackburne, 1 H. Bl. 117, note; Morrison v. Parsons, 2 Taunt. 407; Case v. Davidson, 5 Maule & S. 79; Livingston v. Columbian Ins. Co., 3 Johns. 49; United Ins. Co. v. Lenox, 1 Johns. Cas. 377,

2 Johns. Cas. 443. If so, then he, who receives the benefit, ought to bear the burthens.

In respect to the relative rights of the underwriters on ship and freight, in cases of constructive total losses, and an abandonment by the ship-owner to the respective underwriters, there is a diversity between the English and the American doctrine. In England the doctrine is established, that the underwriter on the ship, after an abandonment, is entitled to the whole freight of the voyage then in the course of being earned, as incident to the ownership of the ship. That was finally adjudged in Case v. Davidson, first by the court of king's bench (5 Maule & S. 79), and afterwards upon error in the executive chamber (8 Price, 559). No distinction was admitted in that case between the portion of freight, which might be deemed earned as a pro rata freight antecedent to the abandonment, and that earned afterward. In America a rule somewhat different has been established in some of our commercial tribunals, which is entitled to the highest respect. The rule is, that up to the time of the loss, the underwriter on freight (like the ship-owner) is entitled to a freight pro rata itineris; and the underwriter on the ship to all which is subsequently earned. In all cases, therefore, where there is a growing freight not absolutely earned, the parties take it, when earned, in the proportion of the voyage performed before and after the abandonment. The cases cited at the bar fully support this doctrine; and what is more material, it has been recognised by the supreme court of Massachusetts, to which state these parties belong. United Ins. Co. v. Lenox, 1 Johns. Cas. 377; 2 Johns. Cas. 443; Davy v. Hallett, 3 Caines, 16; Livingston v. Columbian Ins. Co., 3 Johns. 54; Marine Ins. Co. v. United Ins. Co., 9 Johns. 186; Coolidge v. Gloucester Ins. Co., 15 Mass. 347. As between the different underwriters on ship and freight in the present case, it is clear, upon these principles, that, by the abandonment, the former became entitled to so much freight only as was earned antecedent to the loss for which the abandonment was made, and the underwriters on the ship are entitled to all earned afterwards.

This, then, being the posture of the case as between the respective underwriters, how is it as between the parties now litigating before the court. It is plain that the libellant has, as master, been in the service of the respondents since the time of the acceptance of the abandonment, and retroactively, by operation of law, from the time of the loss. The present case is yet stronger, for the respondents must be deemed by their own acts, with the fullest means of directing the voyage, to have justified the master in the prosecution of it. Whether, after an abandonment to the underwriters on the ship, the latter are bound to prosecute the voyage, as succeeding to the rights and obligations of the owner in statu quo; or whether they may give up the voyage, and undertake any new enterprise, it is unnecessary, in this case, to decide. The language of the books is very direct on this subject (Marsh. Ins. bk. 1, c. 13, § 4; Coolidge v. Gloucester Ins. Co, 15 Mass. 341; Case v. Davidson, 5 Maule & S. 79, 89, 8 Price, 559), but it may be well to reserve any absolute opinion respecting it, until it forms the very point in judgment. Here the original voyage was, in fact, pursued with the unquestionable assent of the respondents, and the freight earned on that voyage has been received by them without objection. Under such circumstances, in ordinary cases, the master would be entitled to receive wages, or an equivalent, for the period of his employment in the service of the respondents. What, then, are the grounds on which his claim is resisted? First, it is said, that he is not entitled to wages as upon the ordinary contract of hire, because here was a special contract, which superseded it. The latter was not extinguished by the abandonment of the ship, and the master's claim must stand, if at all, upon the terms of his original engagement with the ship-owner. In considering this point, it is important to look at the situation of the parties after the abandonment. By that event the respondents became owners of the ship. They elected to pursue the original voyage, and the master also elected to pursue it. If it was competent for either party to break it up, still it was as competent for either party to waive that right. No objection having been made, on either side, to the terms of the original engagement, the fair inference is, that for the residue of the voyage they adopted them, and consequently the master must be understood to be entitled, not to wages as upon ordinary hire, but to his share of the freight in lieu of wages. So far I go along with the argument. But the result of this reasoning is, that if there had been no abandonment, the libellant would have been clearly entitled to his moiety of the freight, subject to the expenditures provided for in the original agreement.

This leads me to the consideration of another objection, which is, that the abandonment of the freight by the master is an extinguishment of his right of recovery; first, because he has been fully indemnified and paid by the abandonees; and secondly, because the abandonment operated as an assignment of the freight now in controversy; and the respondents, having notice, are bound to pay it over to the assignees, and not to the libellant. The first ground is not well founded in point of law. The respondents have nothing to do with the contract of insurance with the underwriters on freight. They are not parties or privies to it. They have paid no premium, and are entitled to no interest in it. It is, as to them, res inter alios acta. Their contract with the master is to pay him his share of the freight; and whether he has been indemnified by others or not,

furnishes no discharge of their obligation. Suppose the master had received the whole freight, there is no pretence to say, that the respondents could recover from him any more than their own moiety.

The other constitutes the main ground of defence. And if it be well founded in law and fact, there will be no difficulty in giving effect to it in the present suit. A court of admiralty is not, like a court of common law, bound by technical rules as to remedies. It acts like a court of equity, ex aequo et bono, and will give effect to the rights of parties, and recognise them, as they would be recognised in a court of equity. If, therefore, the master has made an assignment of his moiety of the freight, valid in equity, this court will give it entire effect, although it may not be such an assignment as would have transferred a remedy at law. See Morrison v. Parsons, 2 Taunt. 407. I agree also to the position, that an abandonment does operate as an assignment, valid between the parties, and sufficient to bind their rights to the extent of its purport. But the difficulty is of another sort. It is to establish, that the abandonment did assign the right to this freight to the abandonees. The general principle has been already stated, viz. that the abandonment to the underwriters on freight conveys no title to the freight subsequently earned. As to them, such freight is deemed a total loss. Whatever is so earned is deemed to be earned by and for the benefit of the new ship-owners; and all contracts respecting the future progress and consummation of the voyage, are at the expense and for the benefit of the new ship-owners. That was the doctrine in Davy v. Hallett, 3 Caines, 16, and it was acted upon to its full extent in Coolidge v. Gloucester Ins. Co., 15 Mass. 341. The whole embarrassment in this case arises from confounding the American with the English doctrine on this subject. By the latter the abandonees of freight, so far as respects the original ship-owner, would, in an adjustment with him, be entitled to an allowance of all the freight earned in the voyage, and received or receivable by him. If the whole freight was earned, they would be entitled to the whole as against him, though as between themselves and the abandonees of the ship, they could make no claim to any of the freight. As has been already stated, the American doctrine is otherwise; and it ought to be adhered to on the present occasion.

The true posture of the present case, with reference to the American doctrine, is, that there was an entire loss of the original voyage and freight, upon the abandonment. In respect to the underwriters on freight and the assured, the voyage from Norfolk to Surinam, and back to New York, was a new voyage, carried on by new parties, under a new contract, grounded, indeed, by the assent of these parties, upon the same stipulations as the original contract, but still substantially new. The master, after the abandonment at least, so far as the underwriters on freight are concerned, was under no obligation to pursue the voyage. It was, as between them and him, entirely at an end. If he elected to go, it was for his own benefit, and not for theirs. They were not subject to the charges of victualling or manning the ship, and there would be no equity in giving them his earnings. If he was under no obligation to go the voyage on their account, or to labor further in their service, it is clear that his acts ought to be referred to his own rights and interests. The short view of the matter, however, is, that the underwriters on freight can claim no more than was assigned to them by the abandonment, and that was only the freight antecedently earned. As, therefore, the freight afterwards earned has not been assigned by the master to any one, he is entitled to recover his moiety of it from the respondents, as an equivalent for his wages. Upon these principles I shall refer the c to a commissioner to report the sum due to the master. The freight for the portion of the voyage from New York to Norfolk, pro rata itineris, belongs to the underwriters on the freight, and the master has no claim upon it. As to the residue, he is to bear all the expenditures provided for in the original agreement with the ship-owners, and with these deductions he is to be allowed his moiety of the freight subsequently earned. Considering the circumstances of this case, it appears to me that the expenses ought to be equally borne by both parties. Decree accordingly.